**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**KATHY ANN BLAKE,**

   **Plaintiff,**

**v.**            **Case No.: 3:11-cv-00317**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

   **Defendant.**

**<u>MEMORANDUM OPINION</u>**

   This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (ECF Nos. 9 and 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 10 and 11). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I. <u>Procedural History</u>**

   Plaintiff, Kathy Ann Blake (hereinafter referred to as "Claimant"), filed for SSI benefits on March 13, 2008, alleging disability since March 1, 2008 due to a back injury and depression. (Tr. at 106–09, 121). The Social Security Administration ("SSA") denied

the application initially and upon reconsideration. (Tr. at 66–70, 76–78). On November 5, 2008, Claimant filed a written request for an administrative hearing, which was held on February 5, 2009 before the Honorable Algernon Tinsley, Administrative Law Judge ("ALJ"). (Tr. at 24–63). By decision dated September 2, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10–23).

The ALJ's decision became the final decision of the Commissioner on March 4, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–6). On May 8, 2011, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on June 2, 2011. (ECF Nos. 7 and 8). Thereafter, the parties filed their briefs in support of judgment on the pleadings. Hence, this matter is ripe for resolution.

## II.   **Claimant's Background**

Claimant was 37 years old at the time of the administrative hearing. (Tr. at 30). She has a high school education and is able to communicate in English. (Tr. at 32). Claimant previously worked as a cook and assistant restaurant manager. (Tr. at 122).

## III.   **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any

step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The

> decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(2).

In this case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since March 6, 2008. (Tr. at 15, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of chronic pain syndrome, depression, and anxiety. (*Id.*, Finding No. 2). The ALJ considered Claimant's history of headaches, high cholesterol, hypertension, thyroid problem, restless leg syndrome, pelvic pain, and shoulder pain but found these medical impairments to be non-severe. (Tr. at 15–16).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 16, Finding No. 3). The ALJ then found that Claimant had the residual functional capacity to perform light exertional work with some additional postural and environmental restrictions. (Tr. at 17, Finding No. 4). Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. (*Id.*). Claimant's environmental limitations required her to avoid exposure to extreme cold, vibrations, and hazards. The ALJ also found that Claimant was able to learn and perform work-like activities with limited contact with others.

As a result, the ALJ determined that Claimant could not return to her past relevant employment as a cashier, cook, cleaner, server, or assistant manager. (Tr. at 21, Finding No. 5). The ALJ noted that Claimant was 36 years old on the date she filed her SSI application, qualifying her as a "younger individual age 18-49." (*Id.*, Finding No. 6). She had a high school education and could communicate in English. (*Id.*, Finding No. 7). The ALJ found that transferability of job skills was not an issue, because the Medical-

Vocational Rules supported a finding of "not disabled" regardless of transferability of skills. (*Id.*, Finding No. 8). He then considered all of these factors and, relying upon the testimony of a vocational expert, determined that Claimant could perform jobs at the light exertional level, such as, weigher/measurer, hand packager, and product inspector, all of which existed in significant numbers in the national and regional economy. (Tr. at 21–22, Finding No. 9). At the sedentary level, Claimant could work as a surveillance systems monitor, grader/sorter, and bench worker. (Tr. at 22). On this basis, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 22, Finding No. 10).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant contends that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to properly analyze the record; in particular, he ignored the findings of Claimant's physical therapist, who observed that Claimant still experienced pain with prolonged weight bearing, forward bending, and when in a protruded head posture for a significant period of time. Claimant also argues that the ALJ overlooked the statements of Claimant's treating physician, Dr. Jason Hudak, regarding the negative impact that Claimant's psychological symptoms and treatment had on her ability to concentrate and stay alert. (Pl.'s Br. at 11–13). As a result, Claimant asserts that the ALJ's RFC assessment was erroneous. (*Id.*).

## V.    **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered each of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court finds that the decision of the Commissioner is supported by substantial evidence.

## VI.   **Relevant Medical Records**

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

### A.      Prior to Disability Onset Date

On August 23, 2004, Claimant was admitted to the Emergency Room at St. Mary's Medical Center following a rear-end automobile collision that caused her to hit her head on the steering wheel. (Tr. at 238-45). Claimant complained of a headache with neck pain, back pain that radiated into her hips, and left lateral rib pain. She stated that movement exacerbated her symptoms. The Emergency Room physician found that Claimant was tender in the thoracic and lumbar regions of the spine, but observed no obvious abnormalities on physical examination.  Claimant's straight leg raising test was negative bilaterally. (Tr. at 239). X-rays of Claimant's cervical, thoracic, and lumbar spine confirmed the absence of significant abnormalities, revealing only some minor degenerative vertebral endplate lipping of the thoracic spine. (Tr. at 239-40). Claimant was discharged home with instructions to see her primary care physician, apply ice and heat, and take Naprosyn for pain.

 On July 20, 2005, Claimant was seen at Carl Johnson Medical Center complaining of pain related to her motor vehicle accident and depression. (Tr. at 185). Claimant was examined by Larissa Pitts, Certified Family Nurse Practitioner, who noted that Claimant had a history of depression and had tried Zoloft without relief of her symptoms. Claimant also reported constant, aching leg pain, with numbness and tingling, which she rated as an eight in severity on a ten point pain scale. Nurse Pitts diagnosed Claimant with depression and lower leg pain. She prescribed an anti-depressant, Lexapro, recommended counseling, referred Claimant to an orthopedist for an evaluation of the leg pain, and instructed Claimant to return in one month. On August 22, 2005, Claimant returned to the Medical Center. (Tr. at 184). She reported that she had stopped taking Zoloft three days earlier because it made her "feel like a

zombie." Claimant refused another anti-depressant at that time. She indicated that her lower back continued to hurt and described feeling a "pop" in her lower back with associated pain in her right leg. On examination, Nurse Pitts noted that Claimant retained a full range of motion in her extremities, had a negative straight leg raising test, and walked with a steady gait. Nurse Pitts diagnosed Claimant with low back pain and depression. She ordered an MRI of Claimant's lumbar spine and encouraged her to keep her appointment with the orthopedist. She also instructed Claimant to monitor her depression for worsening, seek counseling if necessary, and maintain her activity level. (*Id.*).

On October 2, 2006, Claimant consulted with her gynecologist, Dr. Amber Kuhl of United Health Professionals, for complaints of back pain and general weakness. (Tr. at 194–95). Dr. Kuhl documented that Claimant was "tearful" during her visit. (Tr. at 195). At a follow-up appointment on December 4, 2006, Claimant was described as "very moody" and again complained of persistent back pain. (Tr. at 193). Claimant did report that her family physician had prescribed her Prednisone and Flexeril, which had been working to alleviate her pain symptoms.

On January 31, 2007, Claimant called United Health Professionals, crying, and complained that she was edgy, unable to sleep, and felt like she was "going crazy." (Tr. at 451). Dr. Kuhl prescribed Lexapro and instructed Claimant to keep her upcoming appointment. At that appointment, Claimant reported that she was eating "okay" and trying to exercise more; however, she felt "down in the dumps" and was sleeping "all the time" since she started taking Lexapro. (Tr. at 191–92). Dr. Kuhl documented that Claimant was very tearful throughout the appointment. Therefore, Dr. Kuhl added Wellbutrin to Claimant's medication regimen.

On December 10, 2007, Claimant was seen by Dr. Kuhl for an annual visit. (Tr. at 189–90). Claimant complained of chest pain, fatigue, and numbness in her arms and legs. Dr. Kuhl referred Claimant to Jason Hudak, MD, for evaluation of the chest pain. Claimant was examined by Dr. Hudak on December 17, 2007 at which time Claimant reiterated that she felt fatigued on a regular basis and often experienced lower back and chest pain. (Tr. at 439). Dr. Hudak noted that Claimant had been previously diagnosed with endometriosis, osteoarthritis, and depression. Based on his examination, Dr. Hudak diagnosed Claimant with allergic rhinitis, atypical chest pain, osteoarthritis, fatigue, and depression. (Tr. at 441). With respect to Claimant's lower back pain, Dr. Hudak concluded that it was likely due to osteoarthritis and recommended stretches and modifications to Claimant's daily routine to help alleviate her pain symptoms. Dr. Hudak discussed Claimant's depression with her, including possible strategies to help treat her symptoms.

On December 28, 2007, Claimant returned for a follow-up appointment with Dr. Hudak. (Tr. at 436–38). Claimant reported that her mood had improved, but that she continued to experience pain in her neck and back, which disturbed her sleep. (Tr. at 436). Based on his examination, Dr. Hudak diagnosed Claimant with osteoarthritis, muscle strain, lumbago, and primary insomnia. (Tr. at 438). In response to Claimant's continued complaints of back pain, Dr. Hudak prescribed Flexeril, which he also believed would help Claimant sleep at night. Dr. Hudak discussed having x-rays of Claimant's spine taken and physical therapy to help rehabilitate Claimant's back strain. On January 11, 2008, Claimant returned to Dr. Hudak for follow-up of her chronic muscle strain, which had improved somewhat. (Tr. at 433). In addition, her insomnia was "somewhat improved." To address Claimant's lower back and hip strain/sprain, Dr.

Hudak prescribed a course of physical therapy, requiring three sessions per week for six weeks. (Tr. at 220).

On January 30, 2008, Mike Kennedy, PT, of Barboursville Physical Therapy wrote to Dr. Hudak regarding Claimant's complaints of lower back pain. (Tr. at 221–22). He documented that Claimant had experienced chronic lower back pain for the previous eight to nine years, which began when she was pregnant and was exacerbated by a motor vehicle accident in 2004. Claimant's pain was localized in the lumbosacral area radiating into the right leg to the posterior knee and her symptoms were exacerbated by prolonged weight bearing or forward bending. Claimant could not identify any particular activity that alleviated her pain symptoms. Mr. Kennedy outlined his findings on physical examination, stating that Claimant: did not exhibit a shift in standing; had a pain free lumbar range of motion with a flexion of 30 degrees and extension of 10 degrees; had a questionable straight leg raising test on the right and negative on the left, a lower extremity strength of 5/5 bilaterally, symmetrical lower extremity reflexes, and minimal tenderness in the lumbar paraspinals; her SI joint assessment was unremarkable; she had no signs of sensory loss and her ambulation was fairly equal weight bearing. Claimant did show signs of weakness in her back extensors and abdominal muscle groups. Consequently, Mr. Kennedy developed a rehabilitative plan for Claimant that focused on back stabilization exercises and postural correction activities. (Tr. at 222).

On February 12, 2008, Claimant had a follow-up appointment with Dr. Hudak. (Tr. at 430–32). He noted that Claimant's back pain was decreasing and recommended that she continue with physical therapy. (Tr. at 430-32). At physical therapy sessions later that month, Claimant's lower back symptoms vacillated between periods of

improvement and setbacks. (Tr. at 223-24). On February 18, 2008, Claimant stated that she was sore after her last session of physical therapy but that her back was "much better," and by February 22, 2008, Claimant reported no new complaints to Mr. Kennedy, who noted that Claimant tolerated the physical therapy well.

**B.      Relevant Time Period**

Claimant continued with physical therapy throughout March 2008. (Tr. at 225, 426–28). On March 13, 2008, Dr. Hudak noted at a follow-up visit that physical therapy appeared to help Claimant's back; however, she now complained of neck pain. (Tr. at 426). Claimant reported feeling "moody," losing interest in activities that she formerly enjoyed, and stated that she was easily irritated and "snapped" at people. Dr. Hudak prescribed continued physical therapy for Claimant's cervical and thoracic spine with the goal of improving Claimant's range of motion, strengthening her back, and decreasing her lower back pain. (Tr. at 220, 428). He further recommended that the physical therapist add treatment for Claimant's neck and upper back. (Tr. at 428).

On March 21, 2008, Mr. Kennedy noted that Claimant's posture was improving and on March 26, 2008, Claimant indicated that she was feeling better. (Tr. at 226). On April 10, 2008, Mr. Kennedy again wrote to Dr. Hudak notifying him that Claimant had completed her physical therapy program. (Tr. at 312). Mr. Kennedy assessed Claimant as having "fairly functional" cervical and lumbar mobility. He noted that Claimant still had pain from activities involving prolonged weight bearing or forward bending and experienced lingering thoracic and cervical pain if she was in a "protruded head" posture for a significant period of time. Nonetheless, Mr. Kennedy reported that Claimant's reflexes in her extremities were symmetrical; she maintained 5/5 strength and full range of motion in her extremities; and was able to ambulate without deviation.

(*Id.*).

Claimant returned for a follow-up appointment with Dr. Hudak on May 21, 2008. (Tr. at 301–03). Claimant's chief complaint was her persistent depression. (Tr. at 301). According to Claimant she continued to feel restless and anxious despite taking Cymbalta. Dr. Hudak noted that Claimant's anxiety and depression were not controlled by her medication, so he increased the dosage of Cymbalta and added a prescription of Vistaril. (Tr. at 303). At a June 11, 2008 visit, Claimant reported continuing anxiety and depression but admitted that her symptoms were stable with no hallucinations, suicidal ideations, or obsessive thought patterns. (Tr. at 304). Dr. Hudak concluded that Claimant's symptoms of anxiety and depression were now well-controlled by medication. (Tr. at 306). Because Claimant continued to complain of insomnia, Dr. Hudak scheduled a sleep study consultation. He also reassessed the status of Claimant's back pain, noting that Claimant's lumbar MRI was normal and showed no signs of radiculopathy. Dr. Hudak suspected that Claimant's persistent back pain may have been reflective of inadequately treated depression. However, he referred Claimant to a neurologist at her request.

On June 23, 2008, William Beam, MD, performed a nocturnal polysomnography at St. Mary's Medical Center, which revealed reduced sleep efficiency. (Tr. at 380–81). Although sleep onset was within normal limits, slow wave sleep was absent. Dr. Beam diagnosed Claimant with fatigue and malaise, possible periodic limb movement disorder, and hypersomnia. Consequently, Dr. Beam recommended treatment for periodic limb movements and advised Claimant that she should avoid activities such as driving or operating machinery when feeling tired.

On July 9, 2008, Claimant returned for a follow-up appointment with Dr. Hudak.

(Tr. at 415–17). Claimant reported that she did not believe Cymbalta was effective in treating her symptoms of depression and anxiety. (Tr. at 415). Dr. Hudak noted that he would change Claimant's anti-depressant prescription at the next appointment if her depression had not improved. Dr. Hudak reviewed his diagnoses, opining that Claimant's insomnia was likely a result of Claimant's mood disorders. (Tr. at 417). Claimant returned for a follow-up appointment on August 12, 2008. (Tr. at 412–14). Dr. Hudak noted that Claimant's depression was well-controlled, but that Claimant continued to suffer from anxiety; consequently, he prescribed Klonopin to alleviate these symptoms. (Tr. at 414).

On August 27, 2008, Claimant reported that her overall mood had improved since her last appointment. (Tr. at 409–11). Dr. Hudak determined that Claimant's symptoms of anxiety were now well-controlled on her current medication regimen. (Tr. at 411). At an October 7, 2008 visit, Claimant reported that she was doing better on Cymbalta but continued to feel fatigued. (Tr. at 406). Dr. Hudak provided Claimant with samples of Provigil for her excessive fatigue during the day. (Tr. at 408).

On January 7, 2009, Claimant was seen again by Dr. Hudak with complaints of lower back and shoulder pain. (Tr. at 400–03). Claimant reported experiencing pain in her neck radiating down into her arms and lower back pain radiating down to her legs. (Tr. at 400). Treatment notes indicate that Claimant's anxiety symptoms were well-controlled by medication. Dr. Hudak hypothesized that Claimant's lower back pain and neck pain were likely a result of a disc herniation or degenerative disc disease. Accordingly, he ordered another MRI of Claimant's spine and discussed pain management options with Claimant.

On February 7, 2009, William Sheils, MD, at Tri State MRI reviewed an MRI of

- 14 -

Claimant's lumbar spine. (Tr. at 353). Dr. Sheils stated that there was no evidence of disc herniation, canal stenosis, or neural impingement. Dr. Sheils observed small hemangiomata at L2, L3, and L5 and found that the vertebral bodies were anatomically aligned. Other than these incidental vertebral hemangiomata, Dr. Sheils found no significant abnormalities. Next, Dr. Sheils reviewed a MRI of Claimant's cervical spine. (Tr. at 386). Dr. Sheils found that the alignment of Claimant's vertebral bodies was relatively straightened with a very subtle kyphotic curvature. There was no evidence of disc herniation, canal stenosis, or neural impingement. Claimant's cervical spinal cord and craniocervical junction appeared within normal limits. Finally, Dr. Sheils reviewed a MRI of Claimant's thoracic spine. (Tr. at 387). Dr. Sheils found no evidence of disc herniation, canal stenosis, or neural impingement, but noted incidental vertebral hemangiomata involving the body of T9 and, to a lesser extent, T8 and T7. Claimant's spinal cord and vertebral alignment were within normal limits. On February 18, 2009, Claimant returned for a follow-up appointment with Dr. Hudak. (Tr. at 388–90). Claimant complained of continuing symptoms of anxiety. (Tr. at 388). Dr. Hudak reviewed Claimant's MRI studies and noted that they were essentially normal, but did indicate spasms affecting Claimant's posture. (Tr. at 390). Dr. Hudak did not rule out the possibility of myofascial pain syndrome and referred Claimant to the pain management clinic at Cabell Huntington Hospital. He noted that Claimant's symptoms of depression and anxiety were well-controlled.

On April 10, 2009, Claimant was examined by Rehan Memon, MD, at Cabell Huntington Hospital's pain management center. (Tr. at 364–69). Claimant complained of lower back, right leg, and shoulder pain. (Tr. at 364). According to Claimant, the pain was constant, causing numbness, pins and needles, and a tight burning sensation.

Claimant stated that the pain began to increase in the morning when she woke up and that the pain was exacerbated by bending backwards, lying down, reclining, standing, walking, and sitting. Claimant described pain at the tip of her tailbone, leg cramps, her leg giving way, and problems holding objects in her hand. Claimant reported that she quit physical therapy because of constant pain and rated her pain as a nine out of ten in intensity. Claimant stated that her back pain began on its own in 2002 and that it was exacerbated by a car accident in 2004. (Tr. at 365). Claimant also explained that chiropractic treatment and physical therapy did not help relieve her back pain.

Dr. Memon examined Claimant, observing that Claimant could stand and walk without assistance, did not experience paraspinal muscle spasms, had a non-antalgic gait, and could walk on her heels and toes without difficulty or pain. (Tr. at 367). Next, Dr. Memon evaluated Claimant's thoraco-lumbar spine. Claimant exhibited pain in her sacroiliac (SI) joints and trigger points in her gluteal and paraspinal muscles bilaterally. Dr. Memon then turned to Claimant's lower extremities. Dr. Memon found that Claimant's lower extremity movements were unrestricted and non-painful, Claimant exhibited no obvious muscle weakness and  retained maximum muscle strength. (Tr. at 367–68). Based on his examination and review of the records, Dr. Memon diagnosed Claimant with myofascial pain syndrome, piriformis syndrome on Claimant's right, and SI joint syndrome on Claimant's right. (Tr. at 368). On April 15, 2009, Dr. Memon performed a piriformis block. (Tr. at 361–63). On May 19, 2009, Dr. Memon performed a lateral branch block of the primary dorsal rami. (Tr. at 358–60). On June 23, 2009, Dr. Memon performed trigger point injections to treat Claimant's myofascial pain syndrome. (Tr. at 357).

### C.    Agency Assessments

1.    *Physical Assessments*

On May 1, 2008, Drew Apgar, DO, performed a consultative examination report at the request of the West Virginia Disability Determination Service. (Tr. at 252–71). Claimant reported her medical history to Dr. Apgar, who found Claimant to be a reliable historian. (Tr. at 252). Dr. Apgar noted that Claimant was 36 years old, had multiple medical problems, and had been unemployed since October 2007. Her disability claim was based on chronic pain and hypercholerolemia. (Tr. at 253). Claimant complained of chronic pain beginning with injuries to her back from a motor vehicle accident in August 2004. Claimant reported neck pain and migraine headaches, which she treated with Levacet. In describing her symptoms of depression, Claimant denied being suicidal and informed Dr. Apgar that she took Cymbalta to manage her depression. Claimant also reported a history of GERD, which she treated with Prevacid.

Dr. Apgar recorded Claimant's activities of daily living, noting that Claimant had no hobbies, did not read, did not use computers, had no church or club affiliation, and did not participate in any sports or recreational activities except for a limited amount of walking. (Tr. at 255). Claimant did report that she watched television on a regular basis. Dr. Apgar completed a review of Claimant's systems. Claimant complained of general weakness, cold intolerance, night sweats, and fatigue. Reviewing her neurologic system, Claimant admitted suffering from headaches, dizziness, and memory loss, but denied loss of balance, seizures, or confusion. Claimant admitted to suffering from depression, anxiety, and panic attacks. Claimant further stated that she experienced heart palpitations, but denied hypertension or chest pain. With respect to her musculoskeletal system, Claimant reported joint pain, back pain, neck pain, muscle weakness, swollen

joints, tendon strain, and muscle spasm.

Based on his physical examination of Claimant, Dr. Apgar offered some general observations. (Tr. at 256). He noted that Claimant was able to get on and off the examination table without difficulty and that she demonstrated good posture while seated and standing. Claimant moved around the room without difficulty and was able to dress without assistance. Dr. Apgar diagnosed Claimant with chronic pain syndrome, affecting her joints, lumbar spine, and cervical spine. (Tr. at 263). Specifically, Dr. Apgar found that Claimant suffered from myofascial pain of the lumbar and cervical spine. Dr. Apgar also diagnosed Claimant with depression, insomnia, anxiety with chest pain, and GERD by history.

Dr. Apgar next summarized his findings regarding Claimant's ability to engage in substantial gainful activity. First, Dr. Apgar reviewed Claimant's muscle strength and found that Claimant's strength was +5/5 in her upper and lower extremities. Next, Dr. Apgar considered Claimant's grasping ability and found that it was intact bilaterally. Dr. Apgar noted that Claimant's fine coordination, pinch, and manipulation were also intact bilaterally. Further, Claimant was able to perform rapid alternating hand movements without difficulty. Then Dr. Apgar reviewed Claimant's range of motion and concluded that Claimant exhibited no significant compromises. (Tr. at 264). An examination of Claimant's joints revealed no abnormalities or instability. Considering Claimant's ability to ambulate, Dr. Apgar observed that Claimant's gait was steady, deliberate, and weight-bearing. No cane or other assistive device was required for ambulation.

Dr. Apgar reviewed Claimant's symptoms of depression, acknowledging Claimant's self-reports of depression and documented history of treatment. Claimant admitted that she experienced no suicidal ideation. Dr. Apgar observed that Claimant's

interests were not constricted; Claimant exhibited an awareness of events of the world; Claimant demonstrated concern for maintaining current relationships which were supportive; Claimant demonstrated good hygiene and an awareness of means and willingness to improve her circumstances.

Based on these findings, Dr. Apgar concluded that Claimant would have no difficulty with standing, walking, sitting, lifting, carrying, pushing, pulling, handling objects with the dominant hand, hearing, speaking, or traveling. Dr. Apgar considered Claimant's efforts during testing to be satisfactory and consequently found her results to be reliable. Despite Claimant's past medical history, Dr. Apgar found that Claimant's mental status was essentially normal. Claimant's understanding and memory were intact. Claimant was able to maintain concentration and focus throughout the examination. In conclusion, Dr. Apgar found that Claimant would be capable of managing any benefits she was awarded. (Tr. at 265).

On May 15, 2008, Atiya Lateef, MD, completed a physical residual functional capacity assessment at the request of the SSA. (Tr. at 288–95). Dr. Lateef found that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and was unlimited in her ability to push or pull. (Tr. at 289). Claimant's postural limitations restricted her to activities that required only occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling, and never required climbing ladders, ropes, or scaffolds. (Tr. at 290). Dr. Lateef found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 291–92). Claimant's environmental limitations required her to avoid concentrated exposure to extreme cold, vibrations, and hazards, such as machinery and heights. (Tr. at 292). Dr.

Lateef found that Claimant was only partially credible because the medical evidence did not substantiate her allegations regarding the degree of limitation caused by her physical impairments. (Tr. at 293). In conclusion, Dr. Lateef recognized that Claimant suffered from chronic pain as a result of cervical and lumbar spine strain; however, he opined that Claimant could perform light exertional work with certain postural and environmental limitations. (Tr. at 295).

On October 20, 2008, Rabah Boukhemis, MD, completed a second physical residual functional capacity assessment. (Tr. at 339–46). Dr. Boukhemis found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in her ability to push or pull. (Tr. at 340). Dr. Boukhemis acknowledged Claimant's complaints of back pain, noting that no medical imaging was available but that Claimant's neurological exams and physical therapy reports were normal. Claimant's postural limitations restricted her to activities that required only occasionally climbing ladders, ropes, or scaffolds; crouching; and crawling. (Tr. at 341). Dr. Lateef found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 342–43). Her environmental limitations required her to avoid concentrated exposure to extreme cold, wetness, vibrations, fumes and odors, and hazards, such as machinery and heights. (Tr. at 343). In conclusion, Dr. Boukhemis noted that there was no evidence of objective symptomatology for back pain and restricted Claimant to medium exertional work consistent with his RFC assessment. (Tr. at 346).

2.    *Mental Health Assessments*

On May 4, 2008, Lisa Tate, MA, performed a psychological evaluation of Claimant. (Tr. at 248–51). Ms. Tate observed that Claimant walked with a normal gait

and maintained normal posture. (Tr. at 248). Claimant informed Ms. Tate that she was seeking disability benefits on the basis of her back injury and depression. According to Claimant, she began suffering from depression in 1990 after the birth of her first child. (Tr. at 249). Claimant stated that her depression had worsened over time and that she felt depressed 90% of the time. Claimant's symptoms included loss of energy, excessive sleeping, social withdrawal, loss of appetite, headaches, sleep difficulty, and crying. Ms. Tate subsequently reviewed Claimant's medical history. Claimant reported that she began suffering chronic pain in her shoulders, hip, back, and neck in 2004. With respect to mental health treatment, Claimant stated that she received counseling for a few months during her marriage, sometime after 1995, but did not report any inpatient psychiatric admissions, crisis intervention, or regular psychological counseling. Claimant described her activities of daily living, indicating that "if she made it out of bed," she would watch television, perform household chores and personal hygiene, take care of her pets, run errands and cook meals. (Tr. at 250–51). Next, Ms. Tate completed a mental status examination of Claimant. (Tr. at 250). Ms. Tate observed that Claimant's mood was depressed and her affect was mildly restricted. Nonetheless, Ms. Tate concluded that Claimant's thought processes, thought content, perception, judgment, immediate memory, recent memory, remote memory, concentration, and psychomotor behavior were all within normal limits. Ms. Tate found that Claimant's social functioning, concentration, persistence, and pace were all within normal limits and that Claimant was competent to manage any benefits that she received. (Tr. at 251). Ms. Tate diagnosed Claimant with dysthymic disorder.

After Ms. Tate's psychological evaluation of Claimant, an unidentified state agency expert completed a psychiatric review technique at the request of the SSA. (Tr. at

272–85).[1]  The expert found that Claimant's mental impairments were not severe. (Tr. at 272). The state agency expert found that Claimant was mildly limited in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, and pace, and she had not experienced any episodes of decompensation. Based on a review of the evidence, the state agency physician found that Claimant's mental impairments did not satisfy Paragraph "C" criteria. (Tr. at 282-83).

On October 17, 2008, Holly Cloonan, Ph.D, completed a second psychiatric review technique and a mental residual functional capacity assessment at the request of the SSA. (Tr. at 321–34, 335–38). Dr. Cloonan found that Claimant had mild restriction of her activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation. Dr. Cloonan found no evidence to establish the presence of Paragraph "C" criteria. (Tr. at 331-32). Dr. Cloonan reviewed Ms. Tate's mental status examination, the medical records, and Claimant's written descriptions of her mental impairments. (Tr. at 333). Dr. Cloonan acknowledged that Claimant was mostly credible in her report in which she described a deterioration of her mental condition with increased anxiety, noting that Claimant sought treatment from Claimant's primary care physician. Dr. Cloonan then completed a mental residual functional capacity assessment. (Tr. at 335–38). Dr. Cloonan found that Claimant's ability to: remember locations and work-like procedures, understand and remember very short and simple instructions, and to understand and remember detailed instructions was not significantly limited; Claimant could carry out very short and simple instructions; carry

---

[1] This psychiatric review technique is undated and does not identify its author. However, it does refer to Ms. Tate's examination of Claimant. (Tr. at 284).

out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 335–36). Dr. Cloonan also analyzed Claimant's limitations regarding social interaction. (Tr. at 336). Claimant's ability to: interact appropriately with the public and accept instructions and respond appropriately to criticism from supervisors was moderately limited by her mental impairments. Claimant's ability: to ask simple questions or request assistance; get along with coworkers or peers without distracting them; maintain social appropriate behavior and adhere to basic standards of neatness and cleanliness was not significantly limited by her medical impairments. Finally, Dr. Cloonan reviewed Claimant's ability to adapt. Dr. Cloonan found that Claimant's ability to: respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others was not significantly limited by her mental impairments. In conclusion, Dr. Cloonan found that Claimant was able to learn and perform work-like activities with limited contact with others. (Tr. at 337).

## VII.  <u>Analysis</u>

### A.  **ALJ's Consideration of the Opinions of Treating Sources**

Claimant contends that notwithstanding regulations to the contrary, the ALJ gave only superficial attention to the opinions of Mr. Kennedy, Claimant's physical therapist.

Claimant acknowledges that Mr. Kennedy is not an "acceptable medical source," but argues that the ALJ nevertheless was required to consider Mr. Kennedy's opinions on the severity of Claimant's impairments and how these impairments affected her ability to function.

Social Security Ruling 06-03p provides guidance on how the opinions of health care providers, who are not "acceptable medical sources," should be considered on the issue of disability. The Ruling explains that the opinions of "other sources," such as physical therapists, "cannot establish the existence of a medically determinable impairment," but "may provide insight into the severity of the impairment(s) and how it affects the [claimant's] ability to function." *Id.* at 2.  When weighing opinions offered by sources who are not acceptable medical sources, the ALJ should consider factors such as: the length of time the source has known the claimant and the frequency of their contact; the consistency of the source's opinion with the other evidence; the degree to which the source provides supportive evidence; how well the source explains his or her opinion; whether the source has an area of specialty; and any other factors tending to support or refute the opinion. The Ruling emphasizes that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain." Generally, the ALJ must explain the weight given to such opinions "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id* at 5.

In the present case, the ALJ explicitly discussed Mr. Kennedy's findings at multiple points in the written opinion and implicitly incorporated them into the RFC assessment.  (Tr. at 16, 18, 19). Noting that Claimant began physical therapy in January 2008, the ALJ analyzed Mr. Kennedy's treatment records. (Tr. at 18–19). Contrary to

Claimant's position, the vast majority of Mr. Kennedy's notations undermined, rather than supported, her disability claim. Mr. Kennedy frequently observed that Claimant's back pain was improving and her back strength and range of motion were within normal limits. (Tr. at 224, 226, 312). On January 30, 2008, Mr. Kennedy performed a physical examination of Claimant and documented that her lumbar range of motion was pain free with a flexion of 30 degrees and extension of 10 degrees, her lower extremity strength was equal bilaterally and her reflexes were symmetrical. Claimant had minimal tenderness in the lumbar paraspinals with an unremarkable SI joint assessment and no signs of sensory loss. She had a normal stance and fairly equal weight bearing on ambulation. Claimant's primary problem appeared to be weakness in her back extensors and abdominal muscle groups. (Tr. at 221–22). At the conclusion of Claimant's course of physical therapy, Mr. Kennedy found that Claimant had "fairly functional" cervical and lumbar mobility and retained full strength and range of motion in her extremities. (Tr. at 312). He recommended that she continue with an independent program of postural correction exercises at home. While the ALJ did not explicitly address the sentence in Mr. Kennedy's letter regarding Claimant's continued pain, that statement was not particularly useful to the ALJ's assessment of disability. According to Mr. Kennedy, Claimant continued to complain of pain when performing activities that required prolonged weight-bearing or forward bending; however, Mr. Kennedy did not attempt to rate the severity, intensity, or persistence of Claimant's pain, nor provide any opinion as to how the pain affected Claimant's ability to complete basic work activities. Mr. Kennedy provided no function-by-function evaluation. Instead, he merely documented the existence of Claimant's subjective complaints. Moreover, Mr. Kennedy did not recommend additional treatment or place restrictions on Claimant's activities.

Therefore, even in the absence of a discussion regarding Mr. Kennedy's comment, the ALJ clearly met his obligations under SSR 06-03p. He considered the physical therapy records and wrote a decision that sufficiently explained his reasoning for finding that Claimant was not disabled. Although the ALJ is required to *consider* all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to *discuss* all evidence in the record." *Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010) (emphasis added); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009). Consequently, the Court finds the ALJ's consideration of Mr. Kennedy's opinion was appropriate and consistent with the Regulations and case law.

In addition, Claimant argues that the ALJ failed to fully appreciate Dr. Hudak's findings regarding Claimant's depression, anxiety, and fatigue. Claimant asserts that the ALJ simply recited information from exhibits without evaluating any of the evidence contained in the record. According to Claimant, even if her symptoms of depression and anxiety were controlled by medication, Dr. Hudak's findings support the conclusion that Claimant's fatigue and lack of concentration significantly limited her ability to engage in substantial gainful activity. In his written opinion, the ALJ expressly discussed Dr. Hudak's treatment notes concerning Claimant's anxiety, depression, and fatigue. (Tr. at 19–20). The ALJ noted that Dr. Hudak repeatedly found that Claimant's depression and anxiety were stable and "well-controlled" by medication. (Tr. at 20). Claimant reported

no hallucinations, suicidal ideations, or obsessive thought patterns to Dr. Hudak. (*Id.*). A review of the record supports the ALJ's interpretation of Dr. Hudak's treatment notes. Claimant consistently complained of depression, anxiety, and fatigue. However, she took medication only sporadically, received no psychological counseling, and had no history of inpatient hospitalizations or crisis interventions. When she followed a medication regimen, her symptoms of anxiety and depression were well-controlled. Claimant identifies numerous excerpts from Dr. Hudak's treatment notes that she believes support her claim that the ALJ failed to properly consider Dr. Hudak's opinions. (Pl.'s Br. at 13). However, Dr. Hudak's records, taken as a whole, are entirely consistent with the findings and opinions of the agency consultants, who uniformly found Claimant capable of engaging in substantial gainful employment. As previously stated, an ALJ is not required to comment on every finding in a medical opinion. This is particularly true when the medical source opinions of record are consistent. In the instant case, the ALJ reviewed Dr. Hudak's records concerning Claimant's anxiety, depression, and fatigue as well as the detailed findings of multiple state agency mental health experts. (Tr. at 19–20). Dr. Hudak found that Claimant suffered from anxiety, depression, and fatigue, yet he never offered an opinion on any functional limitations caused by these impairments. At no point did Dr. Hudak opine that Claimant was incapable of performing routine work activities or suggest that her psychological symptoms substantially decreased her ability to concentrate or stay alert. The agency experts made observations and findings similar to Dr. Hudak and then took the analysis one step further, explicitly finding that Claimant could engage in basic work activities with some restrictions related to her psychological impairments. The ALJ incorporated these restrictions into the RFC assessment; in fact, he concluded that Claimant's ability

to interact with others was even more limited than assessed by the agency examiner and determined that Claimant should have only minimal contact with others.  Based on the foregoing analysis, the Court finds the ALJ's consideration of Dr. Hudak's opinions was complete and consistent with the applicable regulations.

### B.      RFC Assessment

Finally, Claimant contests the determination that she is capable of light level work, arguing that she is simply unable to meet the demands of light work as defined by 20 CFR § 416.967(b). According to Claimant, treatment notes of Mr. Kennedy and Dr. Hudak support this conclusion. Having carefully reviewed the ALJ's RFC finding and the medical record, the Court rejects Claimant's contention. The ALJ appropriately addressed Claimant's weight-bearing limitations, anxiety, depression, and fatigue in determining her RFC, and his conclusion that Claimant was capable of performing light work is supported by substantial evidence.

The social security regulations define light work as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b). SSR 83-10 provides further clarification of light work, indicating that:

>  Frequent means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting

requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

"[I]n order for an individual to do a full range of work at a given exertional level … the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 83-10. If the claimant's combined exertional and nonexertional impairments allow her to perform many of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent her from doing the full range of work contemplated by the exertional level.

Here, the ALJ did not find Claimant capable of performing a full range of light work. Instead, he determined that Claimant had the physical strength to lift and carry 20 pounds occasionally and 10 pounds frequently, which meet the lifting/carrying requirements of light work, but he then *reduced the range of light work* that Claimant could perform in view of her additional nonexertional restrictions. (Tr. at 17–21). The ALJ properly included all of these limitations and restrictions in his hypothetical questions to the vocational expert. (Tr. 57–58). With full attention given to Claimant's individualized RFC, the vocational expert found a significant number of jobs in the national and regional economy that Claimant could perform. (Tr. at 58–59). This testimony validated the ALJ's conclusion that occupations in the light exertional level were appropriate for Claimant despite her limitations and restrictions.

The medical records provide further evidentiary support for the ALJ's finding that Claimant could perform a reduced range of light level work. Claimant's treating physician provided no opinion that Claimant's medical impairments significantly affected her ability to engage in substantial gainful activity, consistently finding that Claimant's depression and anxiety were well-controlled by medication. Similarly, Mr. Kennedy never found that Claimant was incapable of engaging in substantial gainful activity. At the end of her physical therapy program, Mr. Kennedy recognized that Claimant experienced pain from prolonged weight-bearing activities, but found that Claimant had "fairly functional" cervical and lumbar mobility and retained full strength and range of motion in her extremities. (Tr. at 312). Dr. Apgar performed a consultative examination of Claimant and concluded that Claimant would have no difficulty with standing, walking, sitting, lifting, carrying, pushing, pulling, handling objects with the dominant hand, hearing, speaking, or traveling. (Tr. at 264). Dr. Lateef completed a residual functional capacity assessment and found that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and was unlimited in her ability to push or pull. (Tr. at 289). Dr. Boukhemis completed a residual functional capacity assessment and found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in her ability to push or pull. (Tr. at 340). In addition, three state agency experts reviewed Claimant's mental impairments and all three found that Claimant's mental impairments did not prevent her from engaging in substantial gainful activity. Accordingly, the Court finds that the ALJ's RFC finding is entirely consistent with the social security regulations and rulings and is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** May 22, 2012.

Cheryl A. Eifert
United States Magistrate Judge